IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ALEKSANDER SHUL, *et al.* | ) | CASE NO: 1:21-CV-01945 |
| | ) | |
| Plaintiffs, | ) | JUDGE J. PHILIP CALABRESE |
| | ) | |
| v. | ) | MAGISTRATE JUDGE JENNIFER |
| | ) | DOWDELL ARMSTRONG |
| CITY OF UNIVERSITY HEIGHTS, OHIO | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT CITY OF UNIVERSITY HEIGHTS'
MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR ATTORNEY'S FEES AND COSTS**

Plaintiffs move the Court for an award of nearly a half-million dollars in attorney's fees in a case in which Plaintiffs filed two substantive pleadings (including their motion for attorney's fees). All the fees are claimed for a case that settled on the same terms Plaintiffs would have obtained *without a lawsuit*. Any award for fees and costs must be necessary and reasonable. Plaintiffs' requested award is anything but.

Because Plaintiffs' lawsuit was entirely unnecessary, Plaintiffs are entitled to no more than nominal fees. But even if the Court is inclined to award more than a nominal amount, Plaintiffs must be brought within the bounds of reason. In their motion, Plaintiffs tout the need for "experienced counsel," but billing records reveal that the plurality of work was performed by a two-year attorney at $500 per hour, a rate greater than or equal to that charged by Plaintiffs' co-counsel with over 30 years of experience. Plaintiffs further claim their attorneys expended reasonable hours on this case, but the billing records show over 70 hours spent drafting a Complaint nearly identical to a pleading *Plaintiffs already filed.* Finally, Plaintiffs claim to have achieved novel and excellent results in this case, insidiously perpetuating the falsehood that the

City and its Mayor were hell-bent on preventing Plaintiffs from conducting worship services. Plaintiffs ignore the fact that the Settlement Agreement ("Settlement") resolving this case vindicated the City's years-long effort to simply ask that Plaintiffs stop putting 100-plus people in a residential basement with one exit and no fire protections systems. Plaintiffs were found guilty of these violations of the safety code in the Shaker Heights Municipal Court, and the Court is required to give full effect to a valid state court judgment. *Heck v. Humphrey,* 412 U.S. 477 (1994).

Plaintiffs' counsel are not entitled to a windfall. In light of the woefully disproportionate hourly rates sought, the inexplicable inflation and duplication of billable hours, and the ultimate pointlessness of the litigation, the City respectfully requests the Court deny Plaintiffs' request for nearly half a million dollars in attorney's fees and issue a reasonable, commensurate award.

I.     **FACTUAL BACKGROUND.**

The Settlement reached in this case marked the culmination of the City's years-long effort to get Plaintiffs to follow health and safety standards that protect Plaintiffs and their neighbors. This fact does not need to be litigated, because a valid state court judgment establishes Plaintiffs' violations. (Declaration of Mayor Michael Dylan Brennan at Ex. L, attached.) The interactions between Plaintiff and the City began in 2016, when the City learned that Plaintiff Rabbi Shnior Zalman Denciger was hosting religious services at 4380 University Parkway in University Heights ("Property"), which became known as the Aleksander Shul. (Brennan Aff. at ¶¶ 6, 8.)

The Property is located in a part of the City zoned specifically for single-family residences. The City allows public and semi-public uses—religious or secular—of a single-family residential property if the property owner obtains a Special Use Permit upon recommendation of the City's Plaining Commission and approval by City Council. (*Id*. at ¶¶ 12-15, 17.) This enables the City to ensure that the applicable property is safe for larger gatherings that typify an assembly use, which

2

implicate, among other concerns, fire safety issues, waste disposal issues, and traffic congestion issues that are not ordinarily associated with single-family residences. (*Id*. at ¶ 16.)

The City *never* sought to ban Plaintiffs from holding prayer services or other gatherings. The City only insisted that Plaintiffs, like *any other* property owners regularly using a single-family residence for larger assemblies, obtain a Special Use Permit. (*Id*. at ¶¶ 20, 97.) The City had good reasons for doing so. The Shul hosted gatherings of over one hundred people in the basement, often using open-flame candles. (*Id*. at ¶¶ 10-11.) The basement had no sprinklers and only one method of entry and exit—the staircase. (*Id*. at ¶ 11.) The City met with Plaintiffs multiple times and invited Plaintiffs to apply for a Special Use Permit and work with the City Planning Commission to ensure the safety of the Shul and its neighbors. (*Id*. at ¶¶ 20, 23-24.)

For years, Plaintiffs rebuffed the City's efforts at cooperation, yet the City continued to make efforts to allow the Shul to host religious services while simultaneously addressing safety concerns. Only after Plaintiffs refused to even meet to discuss the submission of an application for a Special Use Permit did the City refer matters to the local prosecutor for charges in the local municipal housing court. (*Id*. at ¶¶ 24.) Thereafter, when Plaintiffs filed a Special Use Permit application and agreed to appear before the City's Planning Commission in November of 2019, the City paused its enforcement efforts in the interest of fostering cooperation. (*Id*. at ¶ 29.)

At the November 21, 2019 City Planning Commission Meeting, the members of Planning Commission, including Mayor Brennan, expressed their support for the Shul's proposed use. However, Planning Commission members also conveyed the City's obligation to make sure that the residential structure was safe for an assembly use. On this basis, and with the agreement and approval from the Shul's legal counsel, the parties agreed to re-convene in February of 2020, at which time the Shul was to present as-built drawings of the home along with a plan to address

3

health and safety concerns, including adequate means of ingress and egress. (*Id*. at ¶¶ 31-34, Ex. A.)

Subsequently, the parties agreed that the City should inspect the premises to allow the City to identify code issues that would need to be addressed to allow the assembly use. The City's Building Commissioner and Fire Prevention Bureau and the Shul's legal counsel attended the inspection on January 15, 2020. On January 23, 2020, the City Building Commissioner issued a memorandum setting forth a list of ten (10) building code issues that would need to be addressed on order for the City to approve the assembly use. (*Id*. at ¶ 23, Ex. C.)

In February of 2020, the Shul returned to the Planning Commission without sufficient drawings and without a plan to address the Building Commissioner's memorandum. At that time, as memorialized in a letter dated February 11, 2020 from the Shul's legal counsel, the parties agreed to limit the number of congregants in the building to 15 at a time. The Shul indicated that it needed additional time to prepare drawings and present a plan to the City. (*Id*. at ¶¶ 46-51.)

The Shul did not return to the City's process until November of 2021, after this litigation commenced. The City actively checked with the Shul to see when they planned to come back to the Planning Commission. The Shul was scheduled to return for a June 2020 Planning Commission Meeting, but days before that scheduled appearance, the City was notified by the Shul's legal counsel that they were not prepared to attend and asked to be removed from the agenda. Thereafter, the City was informed verbally by the Shul's legal counsel that it would not return to the Planning Commission process. It was only *after* Plaintiffs withdrew from the cooperative process that the City was left no choice but to take necessary code enforcement actions in the municipal housing court and Cuyahoga County Court of Common Pleas. (*Id*. at ¶ 58 Ex. G.)

Even as Plaintiffs declined to cooperate substantively with the City, the City made every effort to maintain good relations with Denciger and make sure the Shul could continue hosting prayer services. At Denciger's invitation, City Mayor Michael Dylan Brennan attended a Torah dedication ceremony at the Shul. (*Id*. at ¶¶ 36-38.) After the Building Commissioner found serious fire-safety related building code violations at the Property, the City reached a written agreement with Plaintiffs to allow up to 15 people in the Property as the code violations were addressed, allowing the Shul to meet the minimum quotas for worship services in accordance with the Aleksander sect. (*Id*. at ¶¶ 50, 54.) The City took no further action until Plaintiffs broke their promise, hosting gatherings inside the property that drew nearly 50 vehicles. (*Id*. at ¶ 63.) Plaintiffs' claim that the City "targeted" the Shul or the Orthodox Jewish community is offensive and untrue.

While it was certainly not the City's desire to resolve these serious safety concerns through litigation rather than cooperation, the Settlement agreement reached in this case preserves the health and safety interests the City has championed. Plaintiffs are obtaining a Special Use Permit under the terms and conditions already recommended by the Planning Commission on November 21, 2022 and approved by the City on December 6, 2021. That is the result the City sought all along, and this litigation was avoidable.

## II. LAW AND ARGUMENT

### A. Plaintiffs are entitled to no more than nominal fees because this litigation was entirely unnecessary to achieve Plaintiffs' aims.

Because Plaintiffs unnecessarily initiated and then prolonged this litigation, they are not entitled to any award beyond nominal fees. The Sixth Circuit has established that "the amount of damages awarded as compared to the amount sought in a damages claim is one way to think about the degree of success." *McKelvey v. Secy. of U.S. Army*, 768 F.3d 491, 495 (6th Cir.2014)(Sutton,

5

J.), quoting *Farrar v. Hobby,* 506 U.S. 103, 114 (internal quotation marks omitted). "Few, if any, reasonable litigants would call a monetary judgment that comes in well under the money offered to settle the case a success. And many courts applying various fee-shifting statutes have measured success in part on this basis." *Id.* citing *Ingram v. Oroudjian,* 647 F.3d 925, 927 (9th Cir.2011). The final Settlement resolved this matter largely on terms the City already approved in its normal course of planning and zoning administration *outside* the litigation process. Thus, viewed in proper context, Plaintiffs' relative degree of success is limited, and their award of attorney's fees should be limited to a nominal amount. Plaintiffs' counsel should not receive a windfall at public expense for obtaining through litigation that which could just as easily have been obtained without.

### B. Plaintiffs bear the burden of proving the reasonableness of the fee request.

Even if the Court decides that more than nominal fees are warranted in this case, Plaintiff's fail to carry their burden of proving their request for nearly half-a-million dollars in fees is reasonable. In their motion for attorney's fees, Plaintiffs ask the court to simply approve the rates and hours billed by Plaintiffs' nine attorneys across two firms. But Plaintiffs are not automatically entitled to recover every dollar of attorney's fees they paid. The federal courts recognize that such an approach would produce the sort of "windfall for lawyers" that the courts seek to avoid. *Howe v. City of Akron*, No. 5:06-cv-2779, 2016 U.S. Dist. LEXIS 30937, *19 (N.D. Ohio March 10, 2016). Moreover, such an approach discourages the resolution of litigation, as "many a defendant would be unwilling to make a binding settlement offer on terms that left it exposed to liability for attorney's fees in whatever amount the court might fix on motion of the plaintiff." *Marek v. Chesny*, 473 U.S. 1, 8 (1985) (internal quotations omitted.)

Given these strong disincentives to act as a "rubber stamp" for attorney's fees applications, trial courts have broad discretion to determine *reasonable* attorney's fees awards under 42 U.S.C.

6

§ 1988 which, the Supreme Court recognizes, "are paid in effect by state and local taxpayers." *Perdue v. Kenny A.*, 559 U.S. 542, 559 (2010). "At all times, the Court's focus is on the reasonableness of the fees requested, and the party seeking fees bears the burden of proving that they are reasonable." *Howe* at *17, citing *Reed v. Rhodes*, 179 F.3d 453, 471-72 (6th Cir. 1999).

### C. Plaintiffs' request for nearly half-a-million dollars in attorney's fees for a case that settled after the initial pleading stage is grossly excessive.

In seeking nearly half-a-million dollars in attorney's fees for a case that settled with no discovery and no briefing beyond the Complaint and the City's Answer, Plaintiffs fall woefully short of carrying their burden of proving the reasonableness of their fee request.

The "lodestar method" serves as the baseline for calculating reasonable attorney's fees. *Echols v. Express Auto, Inc.*, 857 F. App'x 224, 227 (6th Cir. 2021). "The lodestar amount is 'the number of hours *reasonably* expended on the litigation multiplied by a *reasonable* hourly rate.'" *Id.* (emphasis added), quoting *City of Riverside v. Rivera*, 477 U.S. 561, 568 (1986). "The lodestar calculation's goal is to provide an amount adequate to attract competent counsel while avoiding a windfall for those counsel." *Echols* at 226. After calculating the appropriate lodestar rate, the district court "may then, within limits, adjust the 'lodestar' to reflect relevant considerations peculiar to the subject litigation." *Adcock-Ladd v. Secretary of the Treasury*, 227 F.3d 343, 349 (6th Cir. 2000), citing *Reed v. Rhodes*, 179 F.3d 453, 471-72 (6th Cir. 1999).

Neither the hours expended by Plaintiffs' counsel nor the hourly rates charged pass muster as reasonable under a lodestar analysis. And it is not a close call.

### 1. Plaintiffs' counsels billing records are littered with duplicative and unnecessary hours.

Hours unreasonably expended must be excluded from an attorney's fees award. *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). In addition to considering whether an attorney actually

7

performed the hours claimed, the trial court must also ask whether an attorney "[spent] too many hours on some part of a case" or "unnecessarily duplicat[ed] the work of co-counsel." *Coulter v. Tennessee*, 805 F.2d 146, 151 (6th Cir. 1986). "Cases may be overstaffed, and the skill and experience of lawyers vary widely." *Hensley* at 434. Accordingly, attorneys for the prevailing party are expected to "make a good-faith effort to exclude from a fee request hours that are excessive, redundant or otherwise unnecessary." *Id*.

Plaintiffs' counsel made no such good faith effort. To the contrary, the billing records submitted with Plaintiffs' motion are littered with unnecessary or duplicative billing. (See Declaration of Marcus Sidoti at p. 11, attached.) The most egregious example is the combined 72.83 hours Plaintiff's counsel spent preparing the Complaint in this matter *after* Plaintiffs filed the same claims in the state court litigation. (*See* Ex. ___, attached.) A simple comparison of the two pleadings shows that the state counterclaim and the Complaint relied on the same factual information and same legal theories. Billing 72.83 hours to re-package facts and claims already alleged is the precise sort of "redundant" and "unnecessary" billing that should not be charged to clients and therefore "are not properly billed to one's adversary pursuant to statutory authority. *Binta B. ex rel. S.A. v. Gordon*, 710 F.3d 608, 628 (6th Cir. 2013).

Plaintiffs served no written discovery. They took no depositions. Aside from the instant motion for attorney's fees, they filed no pleadings beyond the Complaint, and the Complaint was duplicative of a state court filing. In these circumstances, there is simply no justification to force the residents of University Heights to foot the cost for 846.28 hours billed by nine attorneys and 93.99 hours billed by four paralegals. (Sidoti Declaration at pp. 10-11.)

      **2. Plaintiffs claim grossly excessive hourly rates for work performed by Storzer & Associates, the bulk of which was billed by a two-year attorney.**

In addition to inexplicably spending over 70 hours drafting a complaint nearly identical to a pleading already filed in state court, Plaintiffs' Washington D.C.–based counsel seek hourly fees drastically disproportionate to market rates. "A trial court, in calculating the 'reasonable hourly rate component' of the lodestar calculation, should initially assess 'the prevailing market rate in the relevant community.'" *Adcock-Ladd*, 227 F.3d at 350, quoting *Blum v. Stenson*, 465 U.S. 886 (1984). When an attorney agrees to represent a plaintiff in another city or state, that attorney is not entitled to his or her "typical charge for work performed," but, rather, "the rate which lawyers of comparable skill and experience can reasonably command within the venue of the court of record." *Adcock-Ladd* at 350. Accordingly, while five of Plaintiffs' nine attorneys hail from Washington D.C., their rate must be determined by reference to Northern Ohio.

In addition to considering the local market rate, the trial court should also consider an attorney's relative experience when calculating a reasonable hourly rate. Trial courts appropriately differentiate between the hourly rate awarded for work performed by experienced partners within a law firm and the rate awarded for work performed by less-experienced associates. *See, e.g., Project Vote v. Blackwell*, No. 1:06-CV-1628, 2009 U.S. Dist. LEXIS 34571, *49, n. 11 (N.D. Ohio March 31, 2009) ("The Court notes that it reduced the hourly rates for associates far more than for the partners with substantial relevant experience."); *Van Horn v. Nationwide Property & Casualty Ins.*, No. 1:08-CV-605, 2010 U.S. Dist. LEXIS 42357 (N.D. Ohio) (April 30, 2010).

      **a. The $500 per hour rate Plaintiffs seek for the work of a two-year attorney is more than double the reasonable Ohio rate.**

Plaintiffs' Washington D.C.-based counsel makes no attempt to adjust its hourly rates commensurate to its attorneys' experience. The plurality of the work performed on this case was

9

done by Jonathan Gross. At the time, Mr. Gross had two years of experience as a licensed attorney. (ECF No. 48-1, PageID #385.) If Plaintiffs' motion is granted with no modification to the award, Mr. Gross's work will account for over 20 percent of Plaintiffs' award.

Plaintiffs seek an hourly rate of $500 for Mr. Gross. In the Ohio State Bar Association's 2019 survey of the economics of law practice in Ohio ("OSBA Survey"), *no responding associate with fewer than 5 years of experience charged such a rate in Ohio*. Moreover, this is the *same rate* charged by Mr. Gross's law firm colleagues, all of whom had between 19 and 33 years of practice experience. *See* Exhibit 1, p. 46 (attached). And it is a *higher rate* than that charged by *any* of Plaintiffs' Cleveland-based attorneys, including the well-regarded Mr. Slagter, a partner with over 30 years of experience. (ECF No. 48-1, PageID # 386.) Thus, the fees sought for Mr. Gross's work on this case are grossly disproportionate to his relative experience.

The Court should reduce Mr. Gross's hourly rate to a level commensurate with his relative experience and with the Ohio market. Accordingly, the hourly rate charged for Mr. Gross's work should be reduced at least to the more commensurate $260 per hour rate charged in this matter by Danielle Easton, also a two-year associate. (Sidoti Decl. at p. 6.) Absent such a reduction, University Heights residents will be financing an extraordinary windfall profit to Storzer & Associates for the work of an almost brand-new attorney.

### b. Plaintiffs' attempt to justify Storzer & Associates' exorbitant rates with citations to disanalogous, outlier cases.

Perhaps cognizant that their counsels' rates greatly exceed the reasonable market rate, Plaintiffs attempt to justify their exorbitant fee request with citations to some of the most extreme outlier attorney's fees awards in this district. Plaintiffs' comparisons are substantially dissimilar to the circumstances in this case, and as such, these cases are distinguishable. In *Barrow v. City of Cleveland*, the Court approved at $795.68 per hour fee to a "preeminent" attorney in a civil rights

10

case. That rate was approved *for a single attorney*, not an entire team of five attorneys and certainly not for a two-year associate. No. 1:16-CV-923, 2018 U.S. Dist. LEXIS 105912 (N.D. Ohio June 25, 2018). Moreover, the *Barrow* case proceeded to trial and involved "multiple discrimination claims under state and federal law." *Id*. at *2. By contrast, this case involves a single federal statute (RLUIPA) and closely related religious discrimination claims. Notably, even after a full trial, the total attorney fees award in *Barrow* was approximately one fourth of what Plaintiffs seek here for a case that never made it to the discovery stage. *Id*. at *2. Plaintiffs' reliance on *Barrow* to justify a nearly half-million-dollar windfall is misplaced and unreasonable.

Plaintiffs' comparisons to *Northeast Ohio Coalition for the Homeless v. Husted* and *Truex v. Drivers Direct, LLC* fare no better. Plaintiffs' cite the *Husted* court's award of $450 per hour to one specific attorney and $425 per hour to another attorney "with substantial experience and expertise in election laws." (ECF No. 48-1, PageID # 384.) The Court will not doubt note that both those rates are $50-$75 *less* per hour than the rates Plaintiffs seek for their Storzer & Associates counsel. Furthermore, the Court awarded such rates to specific *individual* attorneys, not to an entire *team* of attorneys, and certainly not to inexperienced attorneys. 831 F.3d 686 (6th Cir. 2016). In *Truex,* this Court awarded a $500 per hour rate to a *single attorney* for the plaintiff. 583 F. Supp. 3d 1033, 1036. In doing so, the Court specifically noted that the rate "pushe[d] the outer bounds of reasonableness." *Id*. Furthermore, the *Truex* defendants did not object to the fee application, and the total attorney's fees awarded amounted to $13,150.00—about 3% of what Plaintiffs seek.

Ultimately, the $500 per hour fee rate Plaintiffs seek for an attorney with only two years of experience, is dramatically excessive when compared to Ohio's market rates and unsupported by case law. In conducting its lodestar analysis, the Court should reduce the attorney's rates to

11

reflect their actual experience and the prevailing market in Ohio. A proper lodestar analysis alone would save University Heights residents over six figures in overpayments to Plaintiffs' counsel.

### D. Plaintiffs' award under the lodestar calculation should be further reduced due to the extent of "block billing" by Plaintiffs' counsel.

In addition to billing excessive hours and excessive rates, some of Plaintiffs' counsel engaged in lax billing practices that compromise the ability to review the reasonableness of certain entries. "Where documentation of hours is inadequate, the district court may reduce the [attorney's fees] award accordingly." *Hensley*, 461 U.S. at 424. Insufficiently detailed entries prevent courts from reviewing the reasonableness of hours expended. *See, e.g. Wooldridge v. Marlene Industries Corp.*, 898 F.2d 1169, 1177 (6th Cir.1990). Similarly, courts disfavor the "block billing" of multiple tasks under a single billing entry. Where numerous entries are lumped together under one total the trial court "is left to approximate the amount of time which should be allocated to each task." *Corbis Corp. v. Starr*, 719 F. Supp. 2d 843, 845 (N.D. Ohio 2010) (internal quotations omitted). *See also Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 553 (6th Cir. 2008).

Plaintiffs' award should be further reduced because Plaintiffs' counsel frequently billed for vaguely-defined tasks or engaged in block billing. In fact, the block billing was so pervasive that the City's expert was unable to opine on their reasonableness. (Sidoti Decl. at p. 10.) Not coincidentally, these entries, among others, also demonstrate the "over-lawyering" of this case by Plaintiffs' counsel, with dozens of entries reflecting nothing more than update communications between two or more Plaintiffs' nine attorneys. If the Court awards Plaintiffs attorney's fees beyond a nominal amount, such award should be reduced accordingly to offset this block billing and excessive hours.

### E. Plaintiffs are not entitled to enhancements to the lodestar.

After the Court sets a reasonable lodestar calculation for Plaintiffs' attorney's fees and applies an appropriate reduction of insufficiently specific billing, Plaintiffs are not entitled to any offset of that reduction or to any enhancement of the lodestar. In determining whether to adjust a lodestar calculation, the trial court may look to the 12 "Johnson Factors" first articulated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir.1974). Plaintiffs' motion cites several of these factors as justification for Plaintiffs' steep award request. But these alleged justifications crumble under the slightest scrutiny.

#### 1. The time and labor Plaintiffs' counsel expended was unreasonable and unjustified.

Plaintiffs appear to acknowledge the extraordinary nature of their request for nearly half-a-million dollars in attorney's fees for a case that never proceed beyond the pleading stage. Plaintiff's aver that they consumed "the bulk of the time on front end" by investigating the relationship between the parties and gathering evidence for a "seven-count, 199-paragraph complaint." (ECF No. 48-1, PageID # 387.) But this explanation cannot justify the 72.83 hours Plaintiffs spent drafting their complaint *after* they already gathered the relevant facts and laid out those facts and their legal theories in a state court filing. Nor can it justify the presence of multiple attorneys on routine calls and meetings or the frequent billing of update conversations between multiple counsel. Inefficiency and unnecessary duplication are no basis for enhancing an attorney's fees award, particularly at the public expense.

#### 2. This case involved no particularly novel or difficult questions.

Plaintiffs attempt to establish the novelty of this case on the basis that it involved "the interplay of the City's zoning code and freedom of religion issues." But the resolution of such "interplay" is exactly the purpose for which the RLUIPA statute was adopted. RLUIPA has been

13

in effect for over twenty years, and the Sixth Circuit analyzes RLUIPA claims under a relatively straightforward "three-act play." *Byrd v. Haas*, 17 F.4th 692, 699 (6th Cir. 2021), citing *Cavin v. Michigan Dept. of Corr.*, 927 F.3d 455, 458 (6th Cir. 2019). Furthermore, with respect to the peculiarities of any local zoning issues, Plaintiffs acknowledged the benefit of experienced "local land use counsel" in addition to experienced RLUIPA counsel. ECF No. 48-1, PageID # 390. Thus, Plaintiffs' counsel were not required to dive into any particularly novel or foreign issues.

### 3. Plaintiffs are not entitled to upcharge for their counsels' putative reputations.

Plaintiffs further attempt to justify their extraordinary fees request by relying heavily on the reputation of their counsel. ECF No. 48-1, PageID # 387. However, as noted extensively above, Plaintiffs seek fees disproportionate to their counsel's relative experience. Parties are not required to pay surcharge based on the actual or perceived *renown* of counsel. *Coulter*, 805 F.2d at 149 ("The statute uses the words 'reasonable fees' not 'liberal fees. Such fees are different from the prices charged to well-to-do clients by the most noted and renowned firms in the region."). There is no reason that the customary, market rates are insufficient to draw competent, experienced lawyers to represent litigants such as Plaintiffs. Plaintiffs cannot upcharge University Heights residents simply because they chose to obtain more putatively exclusive counsel.

### 4. The results of this case vindicated the City's safety concerns and preserves the City's land use regulations.

Finally, Plaintiffs rely heavily on the outcome of this case to justify their steep fees request. ECF No. 48-1, PageID# 389. This reliance is severely misplaced and misrepresents the outcome of this case. As outlined above, the City agreed to end the case by allowing Plaintiffs to claim that they are the prevailing party for purposes of moving for attorney's fees only. The Settlement does not dispositively determine any of Plaintiffs' RLUIPA or religious discrimination claims. Furthermore, the Settlement vindicated the City's key interests. The Settlement does not invalidate

14

any City laws. For years, the City has stated that Plaintiffs may operate a Shul *if they obtain a Special Use Permit*. Under the Settlement, Plaintiff may operate the Shul under precisely such a permit and under the conditions specifically approved by the City. Included among the conditions is building code compliance, which will be accomplished by demolition of the existing structure, and construction of a new building, to occur within an established time frame. These conditions mitigate the safety concerns the City asked Plaintiffs to address from the very beginning.

Put another way: when Plaintiffs returned to Planning Commission in November 2021 and provided the information the Planning Commission asked by provided in the February 2020 hearing, Plaintiffs got the approval Planning Commission hope to provide them as discussed at the November 2019 Planning Commission hearing. All Plaintiffs ever had to do was the finish the process they started in 2019 and 2020. Thus, the Settlement hardly represents a one-sided result in Plaintiffs' favor or a particularly novel resolution by Plaintiff's counsel. There is no justification for Plaintiffs to reap a windfall from a reasonable compromise that accorded with the City's ultimate and justified aims.

### III. CONCLUSION

For the reasons set forth above, the City respectfully request the Court deny Plaintiffs' motion for attorney's fees. Plaintiffs demand an award that strays far beyond the bounds of reason. At a minimum Court should reduce the award to reflect reasonable hours, commensurate hourly fees and sound billing practices. Given that the outcome of this case could have been achieved while avoiding litigation entirely, it is, at best, questionable whether Plaintiffs are entitled to any substantive attorney's fees at al. The people of University Heights should not be required to pad lawyers' pockets at the public expense.

        Respectfully submitted,

        */s/ Mark Landes*
        MARK LANDES (0027227)
        DONALD C. BREY (0021965)
        ISAAC WILES & BURKHOLDER, LLC
        Two Miranova Place, Suite 700
        Columbus, Ohio 43215-5098
        Phone: (614) 221-2121
        Fax: (614) 365-9516
        mlandes@isaacwiles.com
        dbrey@isaacwiles.com
        *Attorneys for Defendant*
        *City of University Heights*

## **CERTIFICATE OF SERVICE**

    A true copy of the foregoing was filed electronically on this 22nd day of March 2023. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

        */s/ Mark Landes*
        Mark Landes (0027227)